United States District Court
District of Connecticut

| | | |
|---|---|---|
| **The United States of America** | : | Crim. No. 3:16-cr-243-JCH |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **John O'Brien** | : | |
| **Defendant** | : | April 24, 2017 |

## MEMORANDUM IN AID OF SENTENCING

**I.    INTRODUCTION**

The Defendant, **John O'Brien** respectfully submits this memorandum in aid of sentencing scheduled for May 8, 2017.

On December 29, 2016, O'Brien waived indictment and pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, pursuant to a plea agreement with the Government. Mr. O'Brien accepted responsibility for his actions.

The parties agree that Mr. O'Brien falls into Criminal History Category I. The parties stipulated that the base offense level under U.S.S.G. § 2B1.1(a)(1) is level 7. The loss has been calculated as between $550,000 and $1,500,000, resulting in a 14 level enhancement. The parties agree that two levels should be added because the Defendant abused a position of trust pursuant to §3B1.3. The Government proposes a further two level enhancement for resulting in a substantial financial hardship to one or more victims under U.S.S.G. § 2B1.1(b)(2)(A)(iii). Mr. O'Brien has promptly taken responsibility for his actions, and thus three levels should be subtracted under §3E1.1.

The Government's and Probation's calculation would result in an offense level of 22, and a Guidelines range of 41-51 months. Without the additional 2-level enhancement, the offense level would be 20, with a Guidelines range of 33-41 months. For the following reasons, Mr. O'Brien respectfully submits that a sentence of 18 months imprisonment would be sufficient in his case to meet the goals of sentencing, along with a period of supervised release.

## II. THE GUIDELINES CALCULATION: THE VICTIM-RELATED ENHANCEMENT

Mr. O'Brien takes no position on the additional 2-level enhancement for substantial hardship to a victim. Mr. O'Brien is aware of and extremely remorseful for the harm he has caused those involved in this case. He lives with this regret every day, and frequently becomes emotional or upset because of his guilt. He has, in the view of probation, taken responsibility for his conduct. Mr. O'Brien in no way wishes to minimize or downplay the effects of his wrongful conduct. He takes no position and leaves the government to make its legal arguments regarding this enhancement.

## III. SENTENCING FRAMEWORK: FACTORS TO BE CONSIDERED IN IMPOSING A "REASONABLE" AND "INDIVIDUALIZED" SENTENCE PURSUANT TO 18 U.S.C. § 3553(A)

In Mr. O'Brien's case, a sentence below the advisory Guidelines range would still satisfy the Second Circuit's recognition of the need to avoid unwarranted sentencing disparities while imposing "individualized justice," United States v. Crosby, 397 F.3d 103, 114 (2d Cir. 2005), abrogated on other grounds, United

States v. Fagans, 406 F.3d 138, 142 (2d Cir. 2005), through a sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing.

Title 18, United States Code § 3553(a) provides the framework within which a sentencing judge must determine the appropriate sentence for a defendant:

> Factors to be considered in imposing sentence. The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>     A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>     B. to afford adequate deterrence to criminal conduct;
>
>     C. to protect the public from further crimes of the defendant; and
>
>     D. to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentence available;
>
> (4) the kinds of sentence and the sentencing range established for—
>
>     A. the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines
>
>     . . .
>
> (5) any pertinent policy statement—
>
>     A. issued by the Sentencing Commission . . .
>
> (6) the need to avoid unwarranted sentence disparities

> among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

As the Court is well aware, it has been established since 2005 that the mandatory nature of the Guidelines was unconstitutional, and that the Guidelines' binding authority violated a defendant's Sixth Amendment right to trial by jury. See United States v. Booker, 543 U.S. 220 (2005). While a sentencing court is now still required to consider the Guideline range, it also must consider, equally, the other factors enumerated under § 3553(a) when imposing a sentence. This concept was upheld in Gall v. United States, 552 U.S. 38 (2007), and Kimbrough v. United States, 552 U.S. 85 (2007), where the United States Supreme Court ruled that the District Court is held to no special standard when it departs from the advisory Guidelines, and that such sentences on appeal, no matter how far above or below the Guidelines range, are only reviewed under the highly deferential abuse-of-discretion standard.

Gall's significant limitation on the reach of Appellate Courts to overturn the sentencing decisions of the district court in particular confirms that district courts are once again free to impose "individualized justice" as articulated by the Second Circuit. United States v. Crosby, supra, at 114. Thus, while a sentencing court must consider the applicable Guidelines range, there is no presumption that a sentence within that range satisfies all the objectives of § 3553(a). In fact, neither § 3553(a)

nor the majority opinions in Booker or more recently in Gall and Kimbrough suggest that the sentencing court should give the Guidelines any priority over the other factors listed in § 3553(a).[1] To this end, the Second Circuit has stated that "[i]t is now … emphatically clear that the Guidelines are guidelines - that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008). Indeed, giving the Guidelines any sort of presumptive correctness or weighted consideration would in effect resurrect them to the level of de facto mandatory, which obviously runs afoul of Booker. See United States v. Dorvee, 604 F.3d 84, 93 (2d Cir. 2010) (citing United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006)) (declining to establish "any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable").

Guideline § 1B1.1 sets forth a three-step process for the sentencing court to follow in determining a "reasonable" sentence. The first step requires the sentencing court to determine the correct Guideline range for the case. In the second step, the sentencing court must determine whether a departure from the Guideline range is warranted due to the presence of extraordinary circumstances "of a kind" or "to a degree" that were not adequately considered by the Commission. These two steps

---

[1] It is noteworthy that the majority in Gall declined to adopt Justice Alito's suggestion, in dissent, that the Guidelines should hold "significant" weight to a judge's sentencing decision as compared to the other factors. See Gall, 552 U.S. at 5.

will produce a sentence that is "under the framework set out in the Guidelines."

The third step requires the sentencing court to consider the factors under 18 U.S.C. § 3553(a) taken as a whole in determining an appropriate sentence. In this third step, the court must determine whether to impose a "variance" sentence, which is a sentence outside of the Guideline range (many courts have called this "a non-Guidelines sentence") by considering the factors set forth in Section 3553(a).

In the present case, while the Sentencing Guidelines proposed by Probation have advised a period of 41-51 months imprisonment, full consideration of the other Section 3553(a) factors do not justify such a severe sentence, and demonstrate such a sentence would be unduly severe compared to similar cases. For the reasons articulated below, Mr. O'Brien respectfully requests that the Court downwardly depart from the advisory Guideline range or impose a non-Guidelines sentence (i.e., a "variance") based on his personal characteristics and/or a combination of factors, which under these circumstances would fulfill Judge Newman's recognition of imposing "individualized justice," <u>United States v. Crosby</u>, <u>supra</u>, at 114, as well the statutory mandate that "**a sentence be sufficient, but not greater than necessary**" to comply with the purposes of sentencing. 18 U.S.C. § 3553(a).

**IV.  A SENTENCE BELOW THE GUIDELINES RANGE WOULD BE REASONABLE AND APPROPRIATE IN THIS CASE**

In fashioning an "individualized" and just sentence, 18 U.S.C. § 3553(a) directs the Court to consider "***the history and characteristics of the defendant***."

(emphasis supplied). The circumstances of Mr. O'Brien's offense, his background, and other sentences in similar cases warrant a sentence below the Guidelines range.

Mr. O'Brien's offense represents his first involvement with the criminal justice system, and, while serious, is not so serious as to preclude this Court from considering a below Guidelines range sentence. Further, he presents a minimal risk of recidivism.

### 1. Mr. O'Brien Does Not Present A Risk Of Recidivism

Mr. O'Brien had not been involved with the criminal justice system before this case. He has a clean criminal record, and presents the minimum risk of ending up in the criminal justice system again following this case.

Courts in the past have taken a defendant's unlikelihood of recidivism into account, along with the person's age and lack of criminal history. See United States v. Huckin, 529 F.3d 1312, 1318-19 (10th Cir. 2008) ("….a district court may weigh a defendant's lack of criminal record, even when the defendant has been placed into a Criminal History Category I, in its §3553(a) analysis.").

In United States v. Ward, 814 F. Supp. 23, 24 (E.D. Va. 1993), a departure was warranted because the Guidelines failed to consider the length of time a defendant refrains from the commission of his first crime. ("While awarding defendants generally and this defendant individually some credit for leading relatively crime-free lives, the Criminal History Category of the Sentencing Guidelines does not account for the length of time a particular defendant refrains from criminal conduct.");

see also United States v. Greene, 249 F. Supp. 2d 262 (S.D.N.Y. 2003) ("it is highly unlikely that Greene will repeat his criminal conduct given that he is sixty-five year[s] old and previously had no criminal history points. For all of these reasons, *any* period of incarceration would be inappropriate."); see also United States v. Hernandez, No. 03 CR 1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. 2005) (in finding that the defendant was 49 years old and had no prior criminal record and was therefore a lower risk for recidivism, the Court departed from a Guidelines range of 70-87 months down to 50 months); United States v. Carmona-Rogriguez, No. 04 CR 667RWS, 2005 WL 840464, *4 (S.D.N.Y. 2005) (the Court departed downwards 4 levels based on the fact that the defendant was 55 years old, she had no prior criminal record, she was unlikely to recidivate and she suffered from high blood pressure and diabetes); Simon v. United States, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (District court indicated that Post-Booker, at least one Court has noted that recidivism drops substantially with age. "The Guidelines' failure to account for this phenomenon renders it an imperfect measure of how well a sentence protects the public from further crimes of the defendant."); United States v. Nellum, No. 2:04-CR-30-PS, 2005 WL 300073, at *3 (N.D. Ind. 2005) (the Court departed downwards 4 levels based upon a number of factors, including that the defendant would be 65 years old upon his release, his high blood pressure, blocked prostate, history of a heart attack, and his military service); U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,

p. 12 (May 2004) ("Recidivism rates decline relatively consistently as age increases.").

Mr. O'Brien's conduct in this case was the result of untreated issues that Mr. O'Brien was unaware of, and due to the great pressure he placed on himself to keep up with payments to his ex-wife. ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

**2.    The Court Should Consider Mr. O'Brien's Difficult Upbringing and Impetus For This Offense**

Mental and emotional conditions are not "ordinarily relevant" to sentencing departures, but "in extraordinary circumstances a downward departure may be warranted on the ground that 'extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense.'" United States v. Brady, 417 F.3d, 326, 333 (2d Cir. 2005) (internal citations omitted).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████

　　████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████

　　████████████████████████████████████████████

████████████████████████████████████████████████

　　The reason behind Mr. O'Brien's offense conduct is also relevant in determining that a variance is appropriate. Mr. O'Brien has explained that he took this money largely to pay expensive school tuitions for his children and to keep up with child support and alimony payments. He strenuously disagrees with his wife's claim that he paid a small amount of money to her. Obviously, because of the illegal

withdrawals involved, Mr. O'Brien did not directly pay his ex-wife or the tuition from the IOLTA account. The money was converted to cash first, before going to his ex-wife, because the transfer is illegal. Therefore, it is more difficult to directly trace the funds from the IOLTA account to his alimony and child support payments, but Mr. O'Brien maintains this was the predominant destination for the funds.

From November 2011 to October 2013, the payments to his ex-wife came out of his IOLTA account with TD Bank, or from money being moved from that IOLTA account to the operating account with Chase. Mr. O'Brien would debit from the IOLTA account and give cash to his ex-wife, or would debit the money and then convert it into a bank check made out to his ex-wife. After this period, from November 2013 through January 2015, he would debit the IOLTA account, deposit into the Chase account, and cut a check to his ex-wife. For instance, on December 14, 2013, Mr. O'Brien had pre-cut checks to his ex-wife in the amounts of $400 and $5,000. On December 23, there was a $5,400 withdrawal from the IOLTA account, which was placed into the Chase account. In February 18, 2014, Mr. O'Brien withdrew $5,000 from the IOLTA account, which was placed into the Chase account. There was a check to his ex-wife for $5,000 on February 17. Mr. O'Brien would make out the checks for his ex-wife ahead of time, hoping that funds would come into the operating account to allow him to legitimately cover the payment. When this money did not come in, he moved money from the IOLTA account to the Chase account.

Additionally, if Mr. O'Brien had only paid approximately $42,000 of the owed money to his ex-wife since 2011, she would logically have taken steps sooner than 2016. In an affidavit, she has claimed that Mr. O'Brien stopped making payments in the beginning of 2014, and no payments were made in 2014, 2015, and 2016. However, this timeline is consistent to when Mr. O'Brien was making untraceable payments to her from the IOLTA account through bank checks. He identifies the first time he made the payment through a bank check as February 2013. Other payments came through this method every month in 2013 starting that May. These payments were typically $5,000-$5,500 a month, almost all paid by check. There were only several months, in fall 2014, where Mr. O'Brien was able to make the checks to his ex-wife without transferring any money from the IOLTA account.

Ultimately, the defense emphasizes that the "spreadsheet" kept by his ex-wife does not demonstrate he failed to make required payments for alimony and child support. This sheet is not supported by bank records. A full review of the bank records reveals transactions where consistent cash sums are withdrawn roughly monthly from the IOLTA account with corresponding deposits made to the operating account and corresponding checks. The bank records also reveal these checks were cashed. In fact, the spreadsheet supports Mr. O'Brien's claim that he spent the majority of this money on his family; not only did his ex-wife receive the obligated monthly payments, but she also frequently requested Mr. O'Brien to pay for extra activities. The spreadsheet shows she expected to have Mr. O'Brien pay for activities

such as tuxedo expenses for high school prom, piano lessons, driving school, and sports activities. Mr. O'Brien's divorce did require him to pay for additional expenses, but this was on top of the set monthly payments.

His ex-wife's statements are not credible, and should be disregarded by this Court. She told probation that Mr. O'Brien only paid her $200-$400 at a time, in cash, and never in checks. She also claimed Mr. O'Brien never gave the $6,000 required by the divorce agreement. Merely choosing a period of time at random demonstrates this is patently false. From February through April 2014, Mr. O'Brien wrote six checks to his ex-wife, which checks are included in the discovery provided by the government. These checks will be filed under seal, as Exhibit C. Three of these checks were for $5,000 apiece, with other checks for $2,500, $1,500, and $400. All of these checks were signed over to her now-husband Timothy White by his ex-wife, and cashed. These checks, over a 3 month period, total $19,400, averaging $6,467, exceeding the $6,000 she claims she was never paid. This exercise can be done with other months as well. Her blatantly false statements leave her with no credibility in this matter, and her statements, spreadsheets, and any other information sourced to her should be disregarded entirely.

From 2012 to 2014, Mr. O'Brien estimates $105,000 went to his children's tuition. Tuition was generally due in two payments per year. For two of these years, his children attended the same school, requiring two lump payments of approximately $15,000. Mr. O'Brien generally withdrew this money over a longer

period of time. However, on one occasion, Mr. O'Brien had missed the payment deadline for the tuition, and thus owed two payments. He wrote one check for $31,000 to the high school directly from his IOLTA account, which is the basis for this wire fraud case. From 2012-2014, the tuition money for his children came from Mr. O'Brien's IOLTA account.

       This information is not submitted to absolve Mr. O'Brien of responsibility for his conduct; he is aware and regretful that his conduct was wrongful. However, the impetus for Mr. O'Brien's offense is relevant in determining the severity of sentence required in this matter. While still culpable, the fact that Mr. O'Brien's actions were done to keep up with mounting family obligations makes him less culpable than a defendant who committed fraud to fund an extravagant personal lifestyle of expensive jewelry, vacations, or sports cars. The impetus for his offense should not indicate to this Court that Mr. O'Brien simply wanted items for himself and thus felt he should steal from others; instead, Mr. O'Brien felt immense pressure to fulfill his obligations to those around him and erred greatly in deciding how to relieve that pressure. Again, this does not absolve Mr. O'Brien of responsibility, but this motive, relative to that seen in many other financial crimes, should indicate a less severe sentence is necessary to adequately deter and punish Mr. O'Brien. In this light, a sentence of 18 months imprisonment is reasonable to demonstrate the seriousness of the conduct and punish the offense, while also recognizing Mr. O'Brien's motives.

### 3. The 3553(a) Factors, Especially The Need To Avoid Sentencing Disparities, Support A Below Guidelines Sentence

In weighing the factors set forth in Section 3553(a), the Court is directed to impose the minimum sentence necessary to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense," while taking into account the need for deterrence and to protect the public. In this case, the Court should give particularly consideration to the need to avoid unwarranted sentencing disparities. If the Court determines that multiple sentences could "equally serve the statutory purpose of § 3553," then Court must "consistent with the parsimony clause," impose the lowest possible sentence. United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006).

A search firm has reviewed the sentences in federal financial fraud cases under U.S.S.G. §2B1.1. Data Analysis, Attached As Exhibit A. Between 1999 and 2015 (2016 data is not yet available), 4,514 Criminal History Category I defendants were sentenced for financial crimes with a loss figure of $400,000-$1,000,000.[2] Id., at 4. Nationally, the median sentence was 27.0 months imprisonment, and the average sentence was 27.8 months imprisonment. Id. 40.8% of these defendants received sentences below the guidelines range. Id., at 5.

It is also possible to look more specifically at Second Circuit cases for guidance. 518 of the defendants noted above were sentenced in the Second Circuit,

---

[2] This analysis also excludes those defendants who were granted a departure under U.S.S.G. §5K1.1.

and their sentences were less severe than the national average. Id. The majority of defendants received sentences below the guidelines range, and these sentences averaged 23.7 months imprisonment, with a 24.0 month median sentence. Id., at 5-6 Further still, 58 of these defendants were sentenced in the District of Connecticut. Id., at 6. Their sentences averaged 23.5 months imprisonment and had a median sentence of 24.0 months imprisonment. Id. Again, a majority received sentences below the guidelines range. Id., at 6-7.

The search also narrowed itself to cases where the defendants violated 18 U.S.C. §1343, as Mr. O'Brien did. Here, the average national sentences were even less severe than those imposed for all fraud crimes, with an average sentence of 26.8 months imprisonment for those in Mr. O'Brien's loss category.

Two recent cases in the District of Connecticut also provide guidance for similar conduct by offenders with similar backgrounds. First, in January 2016, in United States v. Pickerstein, Docket No. 3:16-cr-00009-VAB, Harold James Pickerstein pled guilty to mail fraud, with a loss amount of $613,216.20. Similar to Mr. O'Brien, this case involved an abuse of position of trust enhancement, and had the same guidelines calculation, except for the potential enhancement for substantial financial hardship to a victim. Mr. Pickerstein was an attorney who unlawfully withdrew a client's funds from his trust account for a period of years. Mr. Pickerstein also took steps to hide his conduct, including writing false letters. Like Mr. O'Brien, Mr. Pickerstein waived indictment and pled guilty, promptly accepting responsibility

for his actions. Though his plea agreement specified that the parties agreed to a guidelines range of 33-41 months imprisonment, Mr. Pickerstein ultimately received a sentence of one month imprisonment in April 2016.

Second, the Connecticut case of Corey Brinson, United States v. Brinson, Docket No. 3:17-cr-00009-JAM, is also illustrative, particularly as this case just resolved this month. Mr. Brinson pled guilty in January 2017 to violating 18 U.S.C. §1957, by laundering funds derived from fraud. The funds that were laundered through Mr. Brinson's account totaled $4,452,442, a vastly greater sum than that in Mr. O'Brien's case. This laundering scheme took place over nearly six years, and Mr. Brinson's participation, by allowing others to use his name and attorney status to legitimize the transactions, was key in allowing the original fraud to continue. Mr. Brinson agreed that the applicable guidelines range was level 24, and thus a sentence of 51-63 months imprisonment. In April 2017, Mr. Brinson was sentenced to a period of 36 months imprisonment, which would be below the guidelines range proposed by the government in this case.

The conduct of Mr. O'Brien as an attorney unlawfully withdrawing clients funds, and the conduct underlying financial crimes, is not unique. Federal courts frequently encounter cases where a criminal defendant must be sentenced for fraud. The Court can, in this case, use these cases as important guidance for a sentence in this case, while particularly adhering to the §3553(a) requirement to avoid unwarranted sentencing disparities for similar crimes by defendants of a similar

background. The data analysis cited above provides an extremely useful macro view of sentencing for these crimes, and the average sentences for financial crimes with this loss amount is significantly below the government's proposed guidelines range. The average for these cases hovers at approximately 24-27 months imprisonment, and the Defendant respectfully requests the Court view this range as a more appropriate starting point. Additionally, Mr. O'Brien's uniquely difficult background, and the rather unusually mundane and unexciting uses of the proceeds in this case (as opposed to lavish expenses) warrant a variance from the typical case. Finally, focusing on recent Connecticut cases involving attorney fraud is particularly illustrative on a micro level. While Mr. Pickerstein's background differs from Mr. O'Brien's, these differences do not nearly warrant a sentence that is 41 times as severe as Mr. Pickerstein's. Even Mr. O'Brien's proposed sentence, of 18 months, would itself represent a sentence 18 times as severe as Mr. Pickerstein's for remarkably similar conduct. Mr. Brinson's case also provides a similar case where the sentence was far, far below the guidelines range. Also, it demonstrates that the government's proposed guidelines range is overly severe, as a case with many similarities but an exponentially higher loss figure resulted in a lesser sentence. There are not ample reasons for the Court in this case to depart greatly from the sentencing frameworks set forth by the cases above. Ultimately, an analysis of the 3553(a) factors, and the need to avoid unwarranted sentencing disparities, supports a harsh and sufficient, but not excessive, sentence of 18 months imprisonment for

Mr. O'Brien.

## V. CONCLUSION

As cited above, a fundamental principle of sentencing is that a court ***"shall impose a sentence sufficient, but not greater than necessary"*** to meet specified sentencing goals. We respectfully request that the Court sentence Mr. O'Brien to 18 months of incarceration, which would sufficiently and severely punish Mr. O'Brien while remaining appropriately consistent with other cases of similar conduct.

                **THE DEFENDANT,**
                **John O'Brien**

        BY   /s/
             HUBERT J. SANTOS
             Federal Bar No. ct 00069
             TRENT A. LaLIMA
             Federal Bar No. ct 29520
             LAW OFFICES OF HUBERT J. SANTOS
             51 Russ Street
             Hartford, CT 06106
             Tel. (860) 249-6548
             Fax (860) 724-5533

## Certification

       I hereby certify that on the above date, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/_____
TRENT A. LaLIMA